IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| J. MICHAEL FRAZIER and DEBORAH FRAZIER, | ) ) ) |
| Appellants, | ) ) |
| v. | ) Civil No. 3:08-0525 ) Judge Trauger |
| HOWARD POMEROY and EDNA POMEROY, | ) ) ) |
| Appellees. | ) ) ) |

# MEMORANDUM

This is an appeal from the decision of United States Bankruptcy Judge Harrison on a motion for relief from the automatic stay in the case *In re Pomeroy*, No. 3:07-00517. In that decision, Judge Harrison awarded the Appellants (the "Fraziers") $142,886.84 of a Registry Fund held by the Clerk and Master of the Davidson County Chancery Court and awarded the balance of that fund, $45,068.48, to the Appellees' (the "Pomeroys'") bankruptcy estate. (Bankruptcy Court Docket No. 87.) Both sides have appealed the Bankruptcy Court's decision. For the reasons discussed herein, the Bankruptcy Court's decision will be affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

This long-running, intra-family dispute concerns how the proceeds from the sale of a piece of property should be allocated.[1] Deborah Frazier is the Pomeroys' daughter. She and her

---

[1]Unless otherwise noted, the facts are drawn from the parties' appellate briefs (Docket Nos. 3, 5, 6, 10, 11, and 15), and the January 13, 2005 Memorandum and Order of the Chancery

1

husband Michael used to be very close to the Pomeroys. Back in 1989, the Pomeroys and the Fraziers decided to purchase a home together at auction, *i.e.*, the "Buffalo Road" property. The parties hoped that, eventually, they would live together in the Buffalo Road property, but, at the time of purchase, some improvements to the home were needed before it would be a suitable home for both families. Because the Pomeroys were in the better financial position, the Pomeroys purchased the house, had it titled in the Pomeroys' name, and made most of the initial payments on the property. Meanwhile, the Fraziers lived on the property, maintaining and improving it. Once the Fraziers' financial condition improved, they picked up the mortgage payments, and, overall, the Fraziers contributed about two-thirds to the total mortgage payments on the Buffalo Road property. By 1997, it was clear that Dr. Pomeroy's leg injuries would not permit him to ever live at the Buffalo Road property. Therefore, the parties located another piece of property, the "Darden Place" property. The Pomeroys purchased Darden Place with their money and their loans, titled it in the Pomeroy name, and moved there in October 1997.

In May 1998, the parties were able to sell the Buffalo Road property for $415,000, yielding a profit of $274,405.66. Of this profit, $100,000 was used to pay off a down payment loan on the Darden Place property, leaving $174,405.66 in profit, all of which was collected by the Pomeroys. Therefore, despite their mortgage payments and the substantial profit from the sale, the Fraziers received no funds from the sale of the Buffalo Road property. Around this time, the Fraziers moved into Darden Place and, after living there for a short while, insisted that

---

Court for the State of Tennessee, Twentieth Judicial District, Davidson County, Part III in *Frazier v. Pomeroy*, No. 03-1178. (Bankruptcy Court Docket No. 37A.)

the parties obtain a new mortgage on the property and have the property titled in the names of the Pomeroys and the Fraziers. The Pomeroys consented to this arrangement, and a new mortgage and deed were obtained in June 1998. While the refinancing allowed the Pomeroys and the Fraziers to be jointly and equally obligated on the Darden Place mortgage debt, it did not account for the Fraziers' contribution to the Buffalo Road property, *i.e.*, at this point in the machinations of the Frazier/Pomeroy real estate ownership endeavor, the Fraziers still had not been recompensed for their investments in the Buffalo Road property. Over the next several years, the parties shared equally in the major costs of living at Darden Place, *i.e.*, the mortgage, the property taxes, and the insurance. The time span of 2002-2003, however, saw the implosion of the relationship between the Fraziers and the Pomeroys, as the Pomeroys' marital strife, credit card debt, a serious car accident, stresses imposed by the Fraziers' minor child and numerous other problems became too much for the relationship to bear.

After a particularly ugly incident in April 2003, the Fraziers applied for a restraining order in Tennessee state court. The court approved the application and ordered the Pomeroys out of the Darden Place property. In May 2003, the Pomeroys requested that the Tennessee court order the Darden Place property auctioned because of concerns that the Fraziers were committing waste. The court granted the request, and, in August 2003, the Darden Place property was offered for sale at a court-ordered auction. At auction, the Fraziers purchased the property, satisfied all debts thereon, and deposited the proceeds from the sale with the Clerk and Master of the Davidson County Chancery Court. How these proceeds, termed the "Registry Fund," should be allocated has been the subject of litigation for the past five years.

3

Litigation concerning how the money in the "Registry Fund" should be allocated began in Chancery Court shortly after the Darden Place property was sold. After resolving numerous issues regarding the nature of the parties' relationship vis-a-vis Darden Place and Buffalo Road, the Chancery Court issued a twenty-six-page memorandum and order on January 13, 2005, using detailed accounting to make its findings of fact and conclusions of law. First, the court concluded that, "based on the finding of joint ownership [of Darden Place] and the findings above concerning the equal allocation between the parties of the [Darden Place] household account and [Darden Place] line of credit, the Court concludes that the funds on deposit in the registry of the Court should be divided 50/50." (Bankruptcy Court Docket No. 37A at 16.) At the time of the Chancery Court's decision, fifty percent of the Registry Fund was $77,231.79. The Chancery Court also established a $57,877.29 constructive trust in favor of the Fraziers, which was the Fraziers' "contribution to the Buffalo Road property [that] should be accounted for and accredited to them in the purchase of the Darden Place property and in the resulting profitable sale of the Darden Place property." (*Id*.) The court also awarded the Fraziers $2,905.78 to reimburse them for various household expenses incurred during the period of intense discord from April 2003 to August 2003. (*Id*. at 22.) Finally, the court concluded that the Fraziers were also entitled to pre-judgment interest on their one-half of the Registry Fund, which was later clarified to be $14,582.70. (*Id*. at 25.) The court ordered that any "remaining" Registry Fund monies were to be distributed to the Pomeroys, which, at that time, totaled, by this

4

court's calculation, $1,866.01.[2] (*Id.* at 26.)

The Pomeroys appealed to the Tennessee Court of Appeals. The Pomeroys also moved in the Chancery Court to stay removal and disbursement of the Registry Fund pending their appeal. (Bankruptcy Court Docket No. 37C.) The Chancery Court ruled that, so long as the Pomeroys paid $1,254.21 (the monthly interest on the Fraziers' Registry Fund award) into the Registry Fund on the first of each month, removal and disbursement of the Registry Fund would be stayed pending appeal. (*Id.* at 2.) The Pomeroys' monthly payments to the Chancery Court "secure[d] payment of interest upon the sum previously awarded to the [Fraziers]." (*Id.*) The Chancery Court also ordered that the Registry Fund, and any increase therein, be invested in an interest-bearing account to generate maximum return. (*Id.* at 3.) The Pomeroys made monthly interest payments into the Registry Fund through December 2006.

On December 7, 2006, the Tennessee Court of Appeals affirmed the decision of the Chancery Court. (Bankruptcy Court Docket No. 43C at 1.) The only adjustment that the Court of Appeals made to the Chancery Court's ruling was to hold that the $57,877.29 that the Chancery Court had awarded to the Fraziers due to the Fraziers' contributions to the Buffalo Road property should be considered held in a resulting, not a constructive, trust. (*Id.* at 12-13.)

---

[2] This number is arrived at by subtracting $77,231.79 (fifty percent of the Darden Place proceeds), $57,877.29 (Buffalo Road trust money), $14,582.70 (pre-judgment interest), and $2,905.78 (April 2003 to August 2003 expenses) from the $154,463.57 at issue before the Chancery Court. The Fraziers have cited the amount of the Pomeroys' initial award as $1,865.71 (Docket No. 3 at 6), which is thirty cents less than this court's calculation. In disagreeing with the Fraziers' calculation, the court notes that, in their brief, the Fraziers state that $154,463.27 was at issue before the Chancery Court, while the Chancery Court's Memorandum and Order states that $154,463.57 was at issue before it. (Docket No. 3 at 4; Bankruptcy Court Docket No. 37A at 1.)

5

The Pomeroys filed a Rule 11 application in the Tennessee Supreme Court. On January 25, 2007, before the Tennessee Supreme Court could consider the application, the Pomeroys filed for Chapter 13 bankruptcy protection in the Middle District of Tennessee. That case was converted to a Chapter 7 on May 30, 2007. On June 4, 2007, the Fraziers moved in the Bankruptcy Court for relief from the court's automatic stay to allow the Tennessee Supreme Court to decide the Pomeroys' Rule 11 application and to allow the Fraziers to obtain the Registry Fund money. (Bankruptcy Court Docket No. 33.) After a hearing, the Bankruptcy Court lifted the stay to allow the Tennessee Supreme Court to hear the Rule 11 application. The Bankruptcy Court reserved, pending further argument, the issue of whether to lift the stay as to the Registry Fund money until after the state court action was resolved. On November 19, 2007, the Tennessee Supreme Court denied the Pomeroys' Rule 11 application. (Bankruptcy Court Docket No. 72A.)

On April 2, 2008, after further argument on whether to lift the stay as to the Registry Fund, the Bankruptcy Court issued a ruling that classified the various monies in the Registry Fund so that they could be appropriately allocated to the parties in light of the Pomeroys' bankruptcy. The court noted that, as of December 31, 2007, the Registry Fund had swelled to $187,955.32, because of the Pomeroys' monthly payments into the fund and interest. (Bankruptcy Court Docket No. 87 at 4.) The court did not alter the Chancery Court's ruling that the Fraziers are entitled to $77,231.79 as their half of the original Darden Place proceeds. (*Id.* at 5.) The court also did not alter the Chancery Court's ruling that the Fraziers are entitled to $57,877.29, which are the "funds held in trust by the [Pomeroys] for the benefit of the

6

[Fraziers]." (*Id.*) The court also awarded the Fraziers "$7,777.76 for their proportionate share of the accumulated interest on the Registry Fund." (*Id.*) Therefore, the court ordered that the Fraziers were entitled to $142,886.84 out of the Registry Fund. (*Id.*)

As to the remainder of the money in the Registry Fund, the Bankruptcy Court ruled that the following monies were pre-petition debts of the Pomeroys, awarded them to the Pomeroys' bankruptcy estate and noted they were "dischargeable in bankruptcy": (1) the Chancery Court's award of $2,905.78 for the Fraziers' Darden Place expenses from April 2003 to August 2003; (2) the $14,582.70 in pre-judgment interest; and (3) the $25,084.20 that the Pomeroys paid into the Registry Fund to stay disbursal of the fund. (*Id.* at 6.) The Bankruptcy Court also stated that the Pomeroys' bankruptcy estate was entitled to the initial, relatively small award from the Registry Fund that the Chancery Court granted the Pomeroys (by this court's calculation, $1,866.01), along with $1,937.05 "for the [Pomeroys'] proportionate share of the accumulated interest on the Registry Fund." (*Id.*)

Both parties appealed the Bankruptcy Court's order. On appeal, the Fraziers argue, primarily, that the Registry Fund is *in custodia legis* and, therefore, the Pomeroys have no interest therein. The Fraziers also argue that, after the Chancery Court's initial ruling, the Registry Fund operated as a bond, and a bond is not part of the bankruptcy estate. Finally, the Fraziers argue that *res judicata* principles and the *Rooker-Feldman* doctrine prohibited the Bankruptcy Court from reviewing the ownership of the Registry Fund. The Pomeroys respond that the Bankruptcy Court's ruling was correct, except that it should have concluded that the $57,877.29 was a debt of the bankruptcy estate, also dischargeable in bankruptcy.

7

## STANDARD OF REVIEW

This court has jurisdiction over this appeal under 28 U.S.C. §158(a). In hearing an appeal from a bankruptcy court's order, the district court reviews the bankruptcy court's findings of fact for clear error and the court's conclusions of law *de novo*. *In re Rembert*, 141 F.3d 277, 280 (6th Cir. 1998).

## ANALYSIS

All parties claim that the Bankruptcy Court erred. The Fraziers contend that the Bankruptcy Court, supposedly consistent with the Chancery Court's ruling, should have awarded them nearly all of the Registry Fund. The Pomeroys contend that the Bankruptcy Court should have held that the $57,877.29 was a debt, like the Pomeroys' interest payments and other obligations. For the reasons discussed below, however, this court agrees with the findings of the Bankruptcy Court and will affirm that court's judgment.

**I.  The Buffalo Road $57,877.29**

As the Pomeroys concede, "[i]f property is held in [equitable] trust by a debtor prior to the debtor's bankruptcy petition, the equitable interest in such property does not become property of the bankruptcy estate." (Docket No. 5 at 17 *citing In re Morris*, 260 F.3d 654, 666-67 (6th Cir. 2001)). Here, the Tennessee state courts unmistakably found that $57,877.29 was held, pre-petition, in a resulting trust by the Pomeroys in favor of the Fraziers, and this court is bound by principles of *res judicata* to accept that finding. (Bankruptcy Court Docket No. 64C at 12-13; *Bittinger v. Tecumseh Prods. Co.*, 123 F.3d 877, 880 (6th Cir. 1997)). As the Tennessee Court of Appeals explained, the Chancery Court equitably imposed the resulting trust here to

serve the needs of justice, and, therefore, money was awarded to ensure that, in fairness, the Fraziers received the money that they put into the Buffalo Road property but never received back from the Pomeroys. (Bankruptcy Court Docket No. 64C at 12-13.)

Despite this, the Pomeroys argue that "[t]he Bankruptcy Court clearly erred in awarding the Fraziers $57,877.29 because the Chancery Court never traced the Buffalo Road trust through the proceeds from the sale of Darden Place." (Docket No. 5 at 17.) That is, because the Chancery Court (supposedly) never traced the trust funds through the final sale of Darden Place, it was improper for the Bankruptcy Court to assume that the trust money is in the Registry Fund. (*Id.* at 19.) The Pomeroys argue that "[t]he Chancery Court only found that the Fraziers made a loan to the Pomeroys from their equitable interest in Buffalo Road and that the Pomeroys owed a debt of $57,877.29 to the Fraziers." (*Id.*) Therefore, the Pomeroys argue, the Bankruptcy Court went too far, and, because there was no tracing, the Bankruptcy Court should have simply ruled that the Pomeroys have a $57,877.29 debt to the Fraziers. (*Id.*)

The Pomeroys' argument as to the $57,877.29 is solely based on this "tracing" argument and fails to withstand the most basic scrutiny. The Tennessee courts clearly "traced" the Buffalo Road money through the proceeds from the sale of Darden Place, which establishes that the resulting trust money is held in the Registry Fund and that this $57,877.29 "piece" of the Registry Fund may not be considered a debt of the bankruptcy estate. *In re Morris*, 260 F.3d at 666-67. For instance, the Chancery Court found that the $57,877.29 was the Fraziers' "contribution to the Buffalo Road property [that] should be accounted for and accredited to them in the purchase of the Darden Place property and in the resulting profitable sale of the Darden

9

Place property." (Bankruptcy Court Docket No. 37A at 16.) Further, the Court of Appeals wrote, "we think that crediting the Fraziers for their financial contribution to the Buffalo Road house was part of the determination of how to divide up the proceeds from Darden Place. Several other references by the trial court indicate it viewed the analysis the same way." (Bankruptcy Court Docket No. 43C at 6.) Therefore, the final judgment of the Tennessee state courts is plainly that the $57,877.29 resulting trust is held in the Registry Fund, as proceeds from the sale of Darden Place. (*Id*.) Therefore, the conclusion of the Bankruptcy Court, that $57,877.29 of the Registry Fund is held in resulting trust for the Fraziers and is not a debt of the Pomeroys' bankruptcy estate, will be affirmed.

## II. The Remaining Funds

The Fraziers assert that the Bankruptcy Court erred in awarding the Pomeroys' bankruptcy estate $45,068.48 from the Registry Fund. (Docket No. 3 at 6.) Interestingly, the Fraziers do not attempt to follow the logic of the Bankruptcy Court's opinion, which discussed why the various parts of the Registry Fund should be awarded to one party or the other. That said, the Fraziers make three arguments as to why the Bankruptcy Court erred.

First, the Fraziers argue that the Registry Fund is *in custodia legis* (in the custody of the law). The Fraziers cite several cases, none of which are factually similar to this one, in which money that was held *in custodia legis* was held not to be property of the bankruptcy estate. (Docket No. 3 at 8.) Primarily, the Fraziers rely on *Carter Bacon Drilling*, a case in which a Colorado Bankruptcy Court found that a $147,000 bond that the defendant, pre-petition, put *in custodia legis* pending his appeal was not part of his bankruptcy estate. *Carter Bacon Drilling v.*

10

*Excel Energy Corp.*, 76 B.R. 172, 173 (D. Colo. 1987). *Carter Bacon Drilling*, however, only stands for the proposition that a bond paid by a defendant, prior to going into bankruptcy, is not part of that defendant's bankruptcy estate. *Id.*at 174.[3]

The Fraziers essentially ask the court to hold that, once money is in the custody of the court, a potential claimant to that money loses his interest if he enters bankruptcy. No case law provided by the Fraziers stands for that proposition, and the argument strikes the court as flawed. For instance, the Chancery Court ruled that the Pomeroys are entitled to (by this court's calculation) $1,866.01, in cash, from the Registry Fund. Under the Fraziers' interpretation of the case law they provide, the Pomeroys would lose any interest in that $1,866.01 simply because they went into bankruptcy while a court held their assets. As the Fraziers' *in custodia legis* argument is unsupported by law or logic, the court agrees with the Bankruptcy Court that it should be rejected.

Second, and somewhat relatedly, the Fraziers argue that the Registry Fund, including the Pomeroys' post-judgment payments, were a supersedeas bond or judgment security. (Docket

---

[3]Likewise, the *In re Purifiner Dist. Corp.*, *Davis*, and *Elrod* cases relied upon by the Fraziers, while all discussing the doctrine of *in custodia legis*, fail to provide support for the idea that one could lose his rights in a court-held pool of assets simply because that individual entered bankruptcy. *Purifiner*, like *Carter Bacon*, merely stands for the proposition that a non-cash bond deposited with a court prior to bankruptcy is not part of the bankruptcy estate. *In re Purifiner Distrib. Corp.*, 188 B.R. 1007, 1015 (M.D. Fla. 1991). The *Davis* case involves Maine property and family law being used to determine how various assets of a debtor spouse should be apportioned and has little bearing on the issues before this court. *Davis v. Cox*, 356 F.3d 76, 93 (1st Cir. 2004). The footnote in the *Elrod* case that the Fraziers rely on simply states that money held *in custodia legis* is not subject to a "subsequent attachment nor a subsequent execution." *In re Elrod*, 42 B.R. 468, 474 n.7 (E.D. Tenn. 1984). That finding, again, has nothing to do with whether the Pomeroys lost their rights, by virtue of their bankruptcy, to have their bankruptcy estate awarded money by the court.

11

No. 3 at 10.) Because, as noted above, a defendant's pre-petition bond is generally not considered part of the defendant's bankruptcy estate, the Fraziers argue that the Pomeroys have no claim to the Registry Fund assets. (Docket No. 3 at 10.) The case law that the Fraziers rely upon, primarily *In re Pettit*, shows that a pre-petition bond, paid into a court's registry, will generally not be considered property of the debtor's bankruptcy estate. 217 F.3d 1072, 1078 (9th Cir. 2000). In *Pettit*, the entry of the judgment against the defendant was stayed pending appeal, and, to prevent the plaintiff from losing out on the judgment while the appeal was pending, the defendant was obligated to post a bond, which the *Pettit* court determined not to be part of the defendant's bankruptcy estate. *Id.* at 1075-78. The problem, of course, with the Fraziers' reliance on *Pettit* is that there is no bond at issue here.

Here, the funds to pay the judgment were already in the hands of the Chancery Court, so there was no bond to be paid. Rather, the Chancery Court confronted a unique and complicated situation. If it released the money from the Registry Fund, virtually all of it would have gone to the Fraziers, who could have spent it on anything they chose. If the Chancery Court had been reversed, and the Fraziers had already spent the vast balance of the Registry Fund, further litigation and difficulties would have been inevitable. Therefore, the Chancery Court developed a perfectly sensible approach, *i.e.*, holding the Registry Fund money pending appeal but also ordering that the Pomeroys pay interest on the Fraziers' money. Such remedies are permitted under the Tennessee Rules of Civil Procedure where the court deems the circumstances "exceptional," as the Chancery Court apparently did here. Tenn. R. Civ. P. 62.07. In sum, nothing about this unique situation indicates that there was any sort of "bond" paid, and,

12

therefore, the soundly reasoned *Pettit* decision is inapplicable.

Finally, the Fraziers argue that the Bankruptcy Court violated the *Rooker-Feldman* doctrine and *res judicata* principles when it "award[ed] the Registry Funds in a manner inconsistent with the Chancery Court order." (Docket No. 3 at 13.) The Fraziers' argument here is essentially that, because the Bankruptcy Court did not award nearly the same percentage of Registry Fund monies to the Fraziers as did the Chancery Court, the Bankruptcy Court's ruling must be inconsistent with these settled canons of comity. (*Id.*)

There is no doubt that, under these doctrines, it would have been inappropriate for the Bankruptcy Court to have engaged in an appellate review of the issues decided in the state court. *In re Johnson*, 210 B.R. 1004, 1006 (W.D. Tenn. 1997). But such an appellate review plainly did not occur here, as can be seen by exploring what the Bankruptcy Court actually did and did not do. First, the Bankruptcy Court did not alter the Chancery Court's ruling as to the $77,231.79 and the $57,877.29, re-stating that they were to be dispensed from the Registry Fund to the Fraziers. Further, as to the $14,582.70 in pre-judgment interest and the $2,905.78 in expenses, the Bankruptcy Court did not alter the Chancery Court's conclusion that those monies are owed to the Fraziers. The Bankruptcy Court only classified those monies as "pre-petition debts," something which the Bankruptcy Court needed to do and the Chancery Court would not have had occasion to do, as the Pomeroys were not in bankruptcy when the matter was before the Chancery Court. Finally, the Bankruptcy Court resolved issues as to two matters that were not before the Chancery Court, *i.e.*, the post-judgment interest and the interest that had been growing in the Registry Fund while the litigation had been proceeding. Substantively, there was nothing

13

"appellate" about the Bankruptcy Court's decision. Therefore, the Bankruptcy Court's decision was fully in line with the settled principles of comity discussed above.

In relying on its *in custodia legis*, supersedeas bond, and *res judicata/Rooker-Feldman* arguments, the Fraziers curiously fail to address the actual basis of the Bankruptcy Court's decision adverse to their interests, which is that the pre-and-post-judgment interest payments, along with the $2,905.78 in expenses, are considered debts of the bankruptcy estate. (Bankruptcy Court Docket No. 87 at 5-6.) As to the $2,905.78, the Bankruptcy Court was clearly correct in holding that this is a pre-petition debt, as the Chancery Court determined that the Pomeroys owed the Fraziers this money for the 2003 work that the Fraziers performed on Darden Place in the difficult period after the Pomeroys had been ordered to leave but before Darden Place sold at auction. (Bankruptcy Court Docket No. 37A at 4.) In short, the court can conceive of no other way to classify this $2,905.78 than as a pre-petition debt.

As to the $14,582.70 in pre-judgment interest that the Chancery Court awarded the Fraziers and the $25,084.20 in post-judgment interest that the Pomeroys paid into the Registry Fund, the court concludes that, as a matter of law, the Bankruptcy Court correctly determined that both of these items were pre-petition debts. "Pre-judgment interest serves the purpose of compensating a party for the loss of funds to which it was legally entitled." *Brim Holding Co., Inc. v. Province Healthcare Co.*, 2008 WL 2220683, *5 (Tenn. Ct. App. May 28, 2008). Here, the Chancery Court ordered pre-judgment interest to the Fraziers to compensate them for the interest they lost while defeating the Pomeroys' claims that the Fraziers were not entitled to half of the Registry Fund. (Bankruptcy Court Docket No. 37A at 4.) Plainly, this represents a debt.

14

Indeed, "ancillary obligations" (such as interest on the judgment and other fees) to the primary judgment represent bankruptcy estate debt. *See Matter of Gober*, 100 F.3d 1195, 1208 (5th Cir. 1996) (collecting cases).

The same logic applies to the "post-judgment" interest payments as well. Generally, "[t]he purpose of post-judgment interest is to compensate a successful plaintiff for being deprived of the compensation for its loss between the time of the entry of the judgment awarding the compensation until the payment of the judgment by the defendants." *Varnadoe v. McGhee*, 149 S.W. 3d 644, 650 (Tenn. Ct. App. 2004). Again, here, the Chancery Court ordered that the Pomeroys pay a set amount every month so that, assuming the Fraziers prevailed in the state court appeals process, the Fraziers would not risk losing the interest money to which they were entitled. (Bankruptcy Court Docket No. 37C at 2.) Again, this is plainly compensation owed by the Pomeroys to the Fraziers stemming from the main judgment, *i.e.*, an "ancillary obligation" to the primary judgment and, therefore, bankruptcy estate debt. *Gober*, 100 F.3d at 1208. Therefore, it is clear that, as a matter of law, the Bankruptcy Court was correct that the pre-judgment interest, post-judgment interest, and the $2,905.78 in expenses are all fairly considered bankruptcy estate debt and should be dealt with as such in bankruptcy proceedings.[4]

---

[4] Further, consistent with the Bankruptcy and Chancery courts' rulings, the bankruptcy estate is entitled to some money that is not debt. That is, the $1,937.05 "for the [Pomeroys'] proportionate share of the accumulated interest on the Registry Fund" (Bankruptcy Court Docket No. 87 at 6) and Pomeroys' initial, small award from the Chancery Court, which, by this court's calculation, is $1,866.01. (*Id.*)

15

## CONCLUSION

For the foregoing reasons, the April 2, 2008, judgment of the Bankruptcy Court in *In re Pomeroy*, No. 07-00517 (Bankruptcy Court Docket No. 87) will be affirmed.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge

16

Case 3:08-cv-00525   Document 16   Filed 11/25/08   Page 16 of 16 PageID #: 556